**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**COLUMBIA DIVISION**

| | | |
|---|---|---|
| SANTEE PRINT WORKS,<br>Plaintiff, | §<br>§<br>§ | |
| vs. | § | CIVIL ACTION NO. 3:24-4072-MGL |
| FIREMAN'S FUND INSURANCE COMPANY,<br>Defendant. | §<br>§<br>§<br>§ | |

**MEMORANDUM OPINION AND ORDER**
**GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

Santee Print Works filed this lawsuit concerning an insurance dispute against Fireman's Fund Insurance Company. Santee brings claims for breach of contract, bad faith refusal to pay insurance proceeds, an award of attorneys fees under S.C. Code Ann. § 38-59-40, and punitive damages. The Court has diversity insurance over the matter in accordance with 28 U.S.C. § 1332.

Pending before the Court is Fireman's Fund's motion for summary judgment (the motion). Having carefully considered the motion, Santee's response in opposition, Fireman's Fund's reply in support, the record, and the applicable law, the Court will grant the motion.

## II. FACTUAL AND PROCEDURAL HISTORY

In lieu of the Court's usual practice of citing to the amended complaint for the relevant facts in the case, inasmuch as this case is largely concerned with what did not happen, as opposed to what did, the Court will present here a brief summary of the relevant facts in its own words.

This action arises from a commercial property-insurance claim submitted by Santee following storm damage to its manufacturing facility on September 17, 2020. Santee maintained a commercial property insurance policy issued by Fireman's Fund. It is undisputed the September 2020 storm caused covered damage to portions of Santee's facility. Absent here is any argument of Fireman's Fund's invocation of a policy exclusion to deny any portion of the loss.

Fireman's Fund accepted the storm loss as covered and, during the adjustment of the claim, paid Santee more than $6.5 million. It advanced $500,000 within approximately two weeks of the loss and paid approximately $1.8 million for the actual cash value (ACV) of Santee's Bleach Range 2 (BR2) within approximately two months of the loss.

The principal dispute concerns whether Santee is entitled to approximately $8 million or more in replacement-cost benefits for BR2, a piece of industrial machinery destroyed in the storm, but never replaced. The record establishes Santee never paid a deposit toward the purchase of a replacement bleach range, Fireman's Fund Exhibit 4, never paid Morrison Textile Machinery Co. for a replacement machine, Fireman's Fund Exhibit 27, and never had a replacement bleach range manufactured or installed, Fireman's Exhibit 4.

The dispute also encompasses several smaller categories of claimed damages, as identified during discovery and summarized in its outstanding-items spreadsheet. They include $141,123 in additional Hobby Lobby business-interruption losses, $26,400 in salvage value, and approximately $368,759 in allegedly unpaid invoices. The record reflects Santee identified these categories as the damages it continued to seek. Fireman's Fund Exhibit 54.

Two bleach ranges were affected by the storm. BR1 was damaged but could be repaired. Fireman's Fund Exhibit 3. BR2 was destroyed and could not be repaired. *Id.* BR2 had been idle

for more than six months before the storm. Fireman's Fund Exhibit 4. Santee also had a third bleach range, BR5, that had been idle but could be returned to service. Fireman's Fund Exhibit 5. Fireman's Fund approved a plan to make BR5 operational, and Santee's production capacity returned to pre-storm levels within approximately ten weeks of the storm. Fireman's Fund Exhibit 6.

Santee obtained a quote from Morrison for a replacement bleach range. Fireman's Fund Exhibit 9. The October 6, 2020, quote was approximately $6.345 million and estimated a seventy-eight-week manufacturing period. *Id*.

The record reflects Santee failed to make a final decision to purchase a replacement bleach range for a substantial period following the storm. Fireman's Fund Exhibit 2. As late as November and December 2021, Santee's owners remained undecided about whether to replace BR2 and expressed concerns about using the company's own funds to purchase a replacement. Fireman's Fund Exhibit 10.

The policy provides, in pertinent part, Fireman's Fund: "will not pay more" for covered property than the least of three specified amounts, including "[t]he amount you actually spend to repair or replace the covered property." Policy ¶ VI.A.2.b. The policy separately states: "We will not pay on a replacement cost basis until you actually repair or replace the lost or damaged property." Policy ¶ VI.A.2.d. It further says the repair or replacement must be made "as soon as reasonably possible," but "in no event later than two years after the date . . . you sustained covered loss or damage." *Id*.

Thus, the policy contains two distinct requirements material to the present dispute. First, the insured must actually spend money on repairing or replacing the damaged property. Second, the

damaged property must actually be repaired or replaced within the specified period, subject to the policy's "as soon as reasonably possible" requirement. *Id*.

These provisions are significant because Santee did neither. It failed to spend its own funds toward a replacement bleach range, and it did not replace BR2. Fireman's Fund Exhibit 4. The Court notes, however, Santee's insurance broker understood the replacement-cost provision early in the claim. Fireman's Fund Exhibit 12. In January 2021, the broker characterized the requirement as meaning "the replacement cost of the machine will not be paid until the machine is delivered." Fireman's Fund Exhibit 8.

As the claim progressed, Fireman's Fund recognized the time necessary to manufacture and install a new bleach range could exceed the two-year period. Rather than insist upon literal installation within the two-year period, Fireman's Fund offered Santee an accommodation.

In April 2022, which was approximately five months before the contractual deadline, Fireman's Fund advised Santee, to satisfy the replacement requirement, Santee would need to have a signed contract for a replacement bleach range, make a down payment, and demonstrate manufacturing was underway. Fireman's Fund Exhibit 18. Santee's expert, Louis Fey, testified Santee could have accomplished those three things before the deadline. Fireman's Fund Exhibit 19.

A contemporaneous letter likewise stated "replacement" and documentation supporting the purchase, including proof of payment, were necessary before holdback funds would be released. Fireman's Fund Exhibit 17. As the Court has already observed above, Santee nevertheless failed to make the required deposit or establish it had entered into a binding contract with Morrison. Fireman's Fund Exhibit 27. Nor did Morrison commence manufacturing. Fireman's Exhibit 4.

Santee instead makes the fanciful argument a purchase order issued in March 2022 was sufficient. Fireman's Fund disputes that contention and points to evidence the purchase order did not obligate Morrison to build the machine or Santee to pay for it. Fireman's Exhibit 27. As the Court noted earlier, Morrison's president testified a deposit was required and summarized the company's position as: "No deposit, no order." *Id.* Moreover, on May 2, 2022, Fireman's Fund expressly advised Santee "the issuance of a purchase order does not meet the burden of demonstrating replacement." Fireman's Fund Exhibit 64.

On September 12, 2022, just five days before the expiration of the two-year period, Santee's broker requested an extension. Fireman's Fund Exhibit 22. Santee's expert later opined Fireman's Fund should have responded more quickly and granted the extension. Fireman's Fund Exhibit 19.

The record, however, is without evidence Santee would have made the required deposit, entered into a binding contract, or caused Morrison to begin manufacturing had an extension been granted. The record instead establishes Santee never made a payment toward a replacement bleach range. Fireman's Fund Exhibit 4

The distinction is important. Even assuming the two-year deadline could have been extended, the policy independently limited replacement-cost payment to the amount Santee actually spent to repair or replace the property. Policy ¶ VI.A.2.b.

After Santee filed the lawsuit, Fireman's Fund filed this motion for summary judgment, Santee filed a response in opposition, and Fireman's Fund filed a reply in support. Inasmuch as the Court has been fully briefed on all the relevant issues, the motion is ripe for adjudication.

## III. STANDARD OF REVIEW

### *A. Summary Judgment*

Summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show . . . there is no

genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56©; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it might "affect the outcome of the suit under the governing law." *Id.*

On a motion for summary judgment, all evidence must be viewed in the light most favorable to the nonmoving party. *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 123–24 (4th Cir. 1990); *see also Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987) (holding the Court views all facts, and all reasonable inferences to be drawn from them, "in the light most favorable to the nonmoving party"). When multiple parties file motions for summary judgment, as is the case here, the court applies the same standard of review to each motion, and considers "each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003).

***B. South Carolina insurance law***

Because this is a diversity action, South Carolina substantive law governs the interpretation and enforcement of the insurance policy. Under South Carolina law, an insurance policy is a contract, and its terms are construed according to ordinary principles of contract interpretation. *Auto Owners Ins. Co. v. Rollison*, 663 S.E.2d 484, 487 (S.C. 2008). Courts give policy language its plain, ordinary, and popular meaning. *Bell v. Progressive Direct Ins. Co.*, 757 S.E.2d 399, 406 (S.C. 2014).

The judicial function is to enforce the contract the parties made, not to rewrite it. *Stewart v. State Farm Mut. Auto. Ins. Co.*, 533 S.E.2d 597, 601 (S.C. Ct. App. 2000). Where contractual language is clear and unambiguous, its construction is a question of law for the Court. That principle is particularly important here.

## IV. DISCUSSION AND ANALYSIS

### *A. Whether the Court should grant summary judgment on Santee's replacement-cost claim*

#### *1. Whether Santee satisfied the "actually spend" requirement*

The Court begins with this central issue because its resolution substantially disposes of Santee's breach of contract claim. The policy provides Fireman's Fund will not pay more than "[t]he amount you actually spend to repair or replace the covered property." Policy ¶ VI.A.2.b.

The language is unambiguous. The policy's replacement cost provision is an option to be exercised by performance, not a check to be cashed in advance.

The policy does not say Fireman's Fund will pay the amount of a quotation obtained by the insured. It does not say Fireman's Fund will pay the anticipated cost of a replacement machine. And it does not say Santee becomes entitled to replacement-cost benefits merely by expressing an intention to replace damaged property. Instead, the policy establishes an objective limitation: the amount actually spent.

Santee should not expect the fruits of full replacement without first fulfilling the foundational financing. Nevertheless, the undisputed record establishes Santee never paid a deposit toward a replacement bleach range and never paid Morrison any amount toward construction of the machine. Those facts alone defeat Santee's claim for replacement-cost benefits.

The Fourth Circuit's decision, in *Collins Holding Corp. v. Wausau Underwriters Insurance Co.*, 204 F. App'x 208 (4th Cir. 2006), is instructive. Applying South Carolina law, the Fourth Circuit enforced policy language conditioning replacement-cost recovery on actual repair or replacement and rejected an insured's attempt to recover replacement value without satisfying the contractual condition.

Although *Collins Holding* involved a somewhat different policy provision, its fundamental principle applies here: courts enforce the replacement-cost conditions actually contained in the

policy rather than substituting a different arrangement because the insured considers that arrangement preferable.

Santee has failed to establish it actually spent money replacing BR2. It is thus unable to credibly claim a breach of contract against Fireman's Fund when the key that unlocks the coverage was entirely in its own hands.

Consequently, Santee is unable to demonstrate entitlement to replacement-cost benefits under paragraph VI.A.2.b of the policy.

***2. Whether Santee satisfied the "actually repair or replace" requirement***

The policy separately provides Fireman's Fund will not pay replacement cost until the insured "actually repair[s] or replace[s]" the damaged property and requires the repair or replacement to occur within two years of the covered loss. Policy ¶ VI.A.2.d. Santee also neglected to satisfy this requirement.

The language in the policy could not be clearer: Fireman's Fund owes replacement costs only when BR2 is replaced. Replacing the property is thus a condition precedent, and without satisfying that condition, Santee is unentitled to the replacement cost benefit. Neither the law nor equity require Fireman's Fund to finance a reconstruction Santee has no intention, or capability, of undertaking.

Santee admits BR2 was never replaced. Fireman's Fund Exhibit 4. Morrison never began construction of a replacement bleach range, Fireman's Fund Exhibit 27; Santee never paid Morrison, Fireman's Fund Exhibit 4; and missing in the record is any evidence a replacement machine was ever installed. But, replacement cost coverage is a reciprocal covenant, not a unilateral windfall; the insured must build before the insurer must pay.

Indeed, Santee's owner testified Morrison was instructed not to begin building the machine until Santee obtained money from its insurer, Fireman's Fund Exhibit 26, and Morrison confirmed it never began construction, Fireman's Fund Exhibit 27.

Thus, Santee failed both conditions: it neither spent its funds nor replaced the damaged property. "The Sumter facility is now closed and [so] there will never be a new bleach range installed to replace BR2." Motion at 19.

Unfortunately for Santee, it cannot demand the fruits of a replacement cost policy while leaving the field of its own obligations unplowed. The law protects Santee's right to be made whole. It does not protect its desire to profit from a piece of equipment left in ruins.

#### *3. Whether the March 2022 purchase order satisfied the replacement requirement*

Santee makes the merits-challenged contention a March 14, 2022, purchase order satisfies the replacement requirement. The Court is unconvinced.

The policy requires actual repair or replacement and separately limits recovery to the amount actually spent. A purchase order, without payment or actual replacement, fails to satisfy either requirement.

The record further demonstrates Morrison itself did not regard the purchase order as sufficient to create an enforceable obligation. Morrison's president testified the company required a signed order confirmation, a deposit, and preferably signed drawings before proceeding. Fireman's Fund Exhibit 27. He ultimately summarized the company's position this way: "No deposit, no order." *Id.*

Nor did Fireman's Fund accept Santee's characterization of the purchase order as sufficient. Before the two-year deadline, Fireman's Fund expressly stated the issuance of a purchase order failed to satisfy the burden of demonstrating replacement. Fireman's Fund Exhibit 64.

Santee therefore is unable to convert an unenforced purchase order into the actual expenditure and replacement contemplated by the policy.

#### *4. Whether Santee can overcome the two-year-deadline*

Santee argues Fireman's Fund should be disallowed from relying on the two-year deadline because it allegedly delayed the claim, provided unclear guidance, and failed to grant an extension. This argument fails to create a genuine issue of material fact.

Santee never satisfied the two conditions required by the policy before Fireman's Fund had an obligation to make a replacement cost payment: (1) Santee never actually spent any of its own funds on the purchase of a new bleach range, and (2) Santee failed to "replace" BR2 within the two-year deadline. In fact, it never replaced BR2 at all.

There are at least four reasons the Court thinks Santee's extension argument is unavailing. First, it is unnecessary for the Court to determine whether every aspect of Fireman's Fund's handling of the claim was ideal. The dispositive point is the policy contained two separate requirements. Santee failed to satisfy both.

Second, Fireman's Fund refrained from insisting upon literal installation of the new machine within two years. Instead, it offered an accommodation under which Santee could satisfy the replacement condition by entering into a signed contract, making a deposit, and demonstrating manufacturing was underway. Fireman's Fund Exhibit 18. As the Court noted earlier, Santee's own

expert testified these steps could have been completed within the available period. Fireman's Fund Exhibit 19. But, it failed to do so.

Third, Santee has neglected to identify any evidence it would have made the required payment or replaced BR2 if the deadline had been extended. Fireman's Fund specifically identifies the absence of such evidence, and Santee has failed to supply any evidence to fill that gap.

Fourth, finally, and most importantly, an extension of the deadline would not eliminate paragraph VI.A.2.b's separate requirement: Santee actually spend its own money.

The Court therefore concludes the extension dispute fails to create a triable issue regarding Santee's entitlement to replacement-cost benefits. To hold otherwise would require a flight from reality.

#### *5. Whether Santee is entitled to payment replacement costs under the doctrines of waiver and/or estoppel*

Santee also relies upon communications between the parties concerning the replacement-cost claim. But those communications fail to create a triable issue.

Under South Carolina law, "[a] waiver is a voluntary and intentional abandonment or relinquishment of a known right." *Janasik v. Fairway Oaks Villas*, 415 S.E.2d 384, 387 (1992). The evidence here fails to support such a finding.

To the contrary, the communications concerning replacement cost consistently conditioned payment upon Santee's satisfaction of the policy requirements. Fireman's Fund expressly advised Santee a purchase order was insufficient and that payment would require compliance with the policy. Fireman's Fund Exhibit 64.

There is therefore no evidence Fireman's Fund intentionally abandoned its contractual right to require actual expenditure and actual replacement.

Santee's estoppel theory fares no better. Santee has failed to identify evidence of a material misrepresentation by Fireman's Fund upon which Santee reasonably and detrimentally relied. The record instead demonstrates repeated communications concerning the requirements for obtaining replacement-cost benefits.

For want of any evidence to support either waiver or estoppel, Santee's attempt to employ these two doctrines must fail.

***6. Whether the anticipatory breach or prevention doctrine is applicable***

***a. Whether the doctrines of anticipatory breach is applicable here***

To the extent Santee contends Fireman's Fund anticipatorily breached the policy, the claim must fail. South Carolina recognizes anticipatory breach. Under *Collins Holding*, the doctrine may excuse a contractual condition precedent when an insurer unequivocally repudiates its obligation. But the alleged repudiation must be unequivocal, final and absolute, unconditional, directed to the essence of the contract, and accompanied by a clear intention to refuse future performance. *Collins Holding*, 204 F. App'x at 210–11. As opposed to being a balancing test, these requirements must each be met; failure to establish any one defeats the claim.

Santee is unable to satisfy all the requirements. Fireman's Fund never said it would never pay replacement-cost benefits under any circumstances. It instead stated Santee had failed to satisfy the policy's conditions for receiving those benefits. That distinction is dispositive.

In *Collins Holding*, the Fourth Circuit rejected an anticipatory-breach theory where the insurer established and enforced a deadline for rebuilding and later declined to pay replacement value because the insured had not rebuilt by the deadline. *Id.* at 212. The Fourth Circuit held the insurer's conduct was consistent with the policy and therefore did not constitute repudiation. *Id.*

The present case is, if anything, stronger for the insurer. Fireman's Fund, instead of simply imposing a deadline and then refusing payment, also offered an accommodation by which Santee could satisfy the replacement requirement without completing actual installation before the two-year deadline. But Santee failed even to satisfy those relaxed requirements.

Accordingly, Fireman's Fund's denial of replacement-cost benefits was enforcement of the policy, not an anticipatory repudiation of it.

***b. Whether the prevention doctrine is applicable here***

Santee's prevention argument requires separate consideration because, unlike waiver and estoppel, the prevention doctrine can excuse a contractual condition when one party wrongfully prevents the condition from occurring.

South Carolina recognizes the principle a party may not rely upon the failure of a condition precedent when that party wrongfully prevented the condition from occurring. *Champion v. Whaley*, 311 S.E.2d 404, 406–07 (S.C. Ct. App. 1984). The party asserting prevention must present evidence the opposing party's conduct substantially contributed to the condition's nonoccurrence. The prevention must be intentional or involve wrongdoing. *Chambers v. Pingree*, 570 S.E.2d 528, 532–34 (S.C. Ct. App. 2002).

The doctrine therefore fails to excuse a condition merely because the condition was not met. The claimant must first identify evidence the other party materially caused the failure. Santee has failed to do that here.

More importantly, when Fireman's Fund recognized the practical difficulty of manufacturing and installing a replacement bleach range within the two year deadline provided in the policy, it offered Santee a path to satisfy the requirement without completing installation. Again, as the Court

stated earlier, Santee needed to enter into a signed contract, make a deposit, and show manufacturing had begun. Fireman's Fund Exhibit 18. Santee's own expert testified those steps could have been accomplished before the deadline. Fireman's Fund Exhibit 19.

There is no evidence Fireman's Fund prevented Santee from doing any of those things: There is no evidence Fireman's Fund prohibited Santee from signing a contract with Morrison. There is no evidence Fireman's Fund prohibited Santee from paying a deposit. There is no evidence Fireman's Fund prevented Morrison from beginning construction. And there is no evidence Fireman's Fund's conduct made it impossible for Santee to use the $1.8 million ACV payment Santee already received From Fireman's Fund to make a deposit.

Indeed, the record reflects Santee's own owners had remained undecided about replacing BR2 and had expressed reluctance to use company funds for that purpose. Santee is therefore unable to establish Fireman's Fund's conduct substantially contributed to Santee's failure to satisfy the conditions.

Nor can Santee establish the necessary wrongdoing. A dispute between an insurer and insured over the proper interpretation or application of a policy does not, standing alone, constitute wrongful prevention. The Court accordingly rejects Santee's prevention argument.

Consequently, for all the reasons given above, the Court will grant summary judgment on Santee's replacement-cost claim.

***B. Whether the Court should grant summary judgment on the question of whether Fireman's Fund underpaid the ACV of BR2***

Santee also appears to contend Fireman's Fund underpaid the ACV of BR2. This claim fails for three independent reasons. First, Santee fails to directly respond to Fireman Fund's motion for summary judgment on this claim. And, the Court agrees with those other courts which have held,

in failing to respond to an argument, the plaintiff concedes the point. *See. e.g.*, *Ferdinand–Davenport v. Children's Guild*, 742 F. Supp.2d 772, 777 (D. Md. 2010) (dismissing claim where plaintiff failed to respond to defendant's argument); *Kissi v. Panzer*, 664 F. Supp.2d 120, 123 (D.D.C. 2009) ("Because the plaintiff's opposition fails to address the defendants' arguments, the Court may treat the defendants' motion as conceded."). Thus, the Court concludes Santee concedes summary judgment should be granted on its ACV claim.

Second, Santee failed to properly identify an ACV claim in its amended complaint. And third, Santee failed to produce competent evidence establishing it is entitled to a higher ACV.

Consequently, the Court will also grant summary judgment as to Santee's ACV claim.

### *C. Whether the Court should grant summary judgment on Santee's salvage deduction claim*

Santee also seeks $26,400 relating to a salvage deduction for processed fabric Hobby Lobby refused to accept. The record establishes Fireman's Fund deducted the amount based upon salvage value and gave Santee an opportunity to recover that amount by dealing with the identified salvor. Santee failed to take the necessary action and neglected to provide the photographs requested in connection with the salvage issue. Santee's response fails to meaningfully address this claim or identify evidence establishing the deduction was improper.

The party opposing summary judgment cannot simply assert a factual issue exists. Rule 56 requires evidence supporting the asserted dispute. Santee has identified none. Accordingly, the Court will grant summary judgment as to Santee's salvage, too.

### *D. Whether the Court should grant summary judgment on whether Santee is entitled to payment for the outstanding invoices*

Santee claims Fireman's Fund failed to pay approximately $368,759 in outstanding invoices. Fireman's fund addressed the invoices individually in its motion, explaining the invoices involved such matters as losses unrelated to the storm, repairs that were not completed, or insufficient documentation.

Santee's only response, however, is this:

> Disputes over whether specific invoices are loss-related repairs versus upgrades, and whether they are payable at replacement cost or actual cash value, are typically fact-intensive and not suitable for summary resolution where the record supports competing inferences. Santee has identified over half a million dollars in unpaid invoices . . . Fireman's Fund unreasonably withheld or undervalued. Whether these line items are covered, partially covered, or upgrades is a classic fact question. These issues should be tried, not resolved on summary judgment.

Response at 23.

That is it. There is nothing else. This is the entirety of Santee's argument it is due payment of "over half a million dollars in unpaid invoices[.]" *Id.* The parties fail to explain this discrepancy with the approximately $368,759 amount.

Santee bears the burden of establishing each claimed invoice represents a covered storm-related loss and all applicable policy conditions were satisfied. But, Santee has failed to identify the specific invoice, the particular policy provision, the evidence of storm causation, or the evidence demonstrating compliance with the applicable conditions for each invoice.

Surely, no one would ever suppose, suggest, or suspect it is within the purview of this Court to take these four simple sentences from Santee, in a counseled case, fashion an argument, adorn it with legal as well as evidentiary citations to the record, and then judge the strength of its own

argument. It is outside the ambit of the Court's role to do so. Or, as the Fourth Circuit put it, "it [is] well within [the Court's] discretion in refusing to ferret out the facts . . . [Santee's] counsel had not bothered to excavate." *Cray Communications, Inc. v. Novatel Computer Systems, Inc.*, 33 F.3d 390, 396 (4th Cir. 1994).

The Court's conclusion is further braced by the Fourth Circuit's holding nothing more than a summary statement of a claim is insufficient to sustain it. *See Russell v. Absolute Collection Servs., Inc.*, 763 F.3d 385, 396 n. * (4th Cir. 2014) (noting failure to present legal arguments waives the argument). Consequently, this "perfunctory and undeveloped claim [by Santee is deemed] waived." *Id.*

A conclusory assertion this "is a classic fact question[,]" Report at 23, fails to create a genuine issue of material fact. Santee must identify evidence from which a jury could actually find in its favor. But, it failed to do so. Therefore, the Court will grant summary judgment on Santee's invoice claim as well.

### *E. Whether the Court should grant summary judgment on the Hobby Lobby business-interruption losses question*

Santee claims an additional $141,123 in business-interruption losses arising from Hobby Lobby's cancellation of its solid-program business. The record demonstrates the parties disputed whether Hobby Lobby's decision was caused by the storm. Santee had experienced difficulties with Hobby Lobby unrelated to the storm, including personnel issues and difficulties obtaining raw materials. A Hobby Lobby representative testified Santee was already at risk of losing the business before the storm because it was considered an unreliable supplier. Fireman's Fund Exhibit 46.

Fireman's Fund's consultants initially concluded the loss of the Hobby Lobby solid program could not be connected to the storm. Nevertheless, Fireman's Fund ultimately compromised the causation dispute and agreed to pay $582,663 in related losses.

The remaining $141,123 resulted from an adjustment to Santee's forensic accounting calculations concerning labor savings associated with the future loss. Significantly, Santee's own consultant, James Burgess of Ankura, was confronted with the adjustment during his deposition and agreed the methodology of Martin Driscoll & Damico, LLP, another forensic accounting firm Fireman's Fund hired to help it evaluate this component of the claim, was reasonable with respect to the future-loss calculation. Fireman's Fund Exhibit at 69. Santee has failed to identify any evidence contradicting that testimony.

Nor has Santee identified evidence establishing storm causation for the additional $141,123. As Fireman's Fund correctly notes, Santee cannot create a jury issue merely by asserting there are "conflicting accountant opinions[,]" Response at 23, when its own consultant agreed with the challenged calculation and Santee has identified no contrary testimony or affidavit.

The Court will therefore also grant summary judgment as to the Hobby Lobby claim.

***F. Whether the Court should grant summary judgment on Santee's bad faith claim***

"The elements of a cause of action for bad faith refusal to pay first party benefits under a contract of insurance are: (1) the existence of a mutually binding contract of insurance between the plaintiff and the defendant; (2) refusal by the insurer to pay benefits due under the contract; (3) resulting from the insurer's bad faith or unreasonable action in breach of an implied covenant of good faith and fair dealing arising on the contract; (4) causing damage to the insured." *Crossley v. State Farm Mutual Automobile Insurance Co*., 415 S.E.2d 393, 396–97 (S.C. 1992).

The Fourth Circuit has recently reiterated the insured bears the burden of proving all elements and "[i]f there is a reasonable ground for contesting a claim, there is no bad faith." *Peacock Automotive LLC v. Granite State Insurance Co*., 110 F.4th 307, 319 (4th Cir. 2024).

The record here establishes a reasonable basis for Fireman's Fund's decisions.

***1. Whether Fireman's Fund had a reasonable basis for denying Santee's replacement cost claim***

Fireman's Fund had an objectively reasonable basis for refusing to pay more than $8 million in replacement cost for a machine Santee had never purchased, never paid for, never caused to be manufactured, and never installed.

The policy expressly required actual expenditure and actual replacement. Santee satisfied neither requirement. That is a reasonable contractual basis for denial.

***2. Whether Fireman's Fund had a reasonable basis for denying Santee's ACV claim***

Fireman's Fund had a reasonable basis for the $1,808,325 ACV calculation. Its consultant inspected the machine, considered its age and condition, and calculated depreciation. Santee's own broker expressed no objection to the calculation, and Santee's CPA considered the depreciation calculation reasonable. Thus, Fireman's Fund had a reasonable basis for denying this claim.

***3. Whether Fireman's Fund had a reasonable basis for denying Santee's Hobby Lobby claim***

Fireman's Fund initially disputed causation but ultimately compromised the claim and paid a substantial amount. The remaining reduction was supported by an accounting analysis Santee's own consultant later agreed was reasonable. Lacking from the record is any evidence to the contrary. Accordingly, the Court concludes Fireman's Fund had a reasonable basis for denying this claim.

***4. Whether Fireman's Fund had a reasonable basis for denying Santee's salvage and invoices***

Santee has failed to produce any evidence showing Fireman's Fund lacked a reasonable basis for the salvage deduction or for its treatment of the outstanding invoices.

***5. Whether Santee can establish bad faith based on Fireman's Fund's alleged delays and claim handling***

Santee also complains generally about the handling of the claim, including alleged payment delays, communications concerning a possible policy renewal, Fireman's Fund's preference for a particular roofing contractor, and the failure of adjusters to visit the facility. But, these allegations fail to establish bad faith.

The policy itself provides payment is late only when more than thirty days have elapsed after the insured has submitted a properly executed sworn statement of loss and the parties have reached agreement on the amount of loss. Fireman's Fund Exhibit 1.

Santee has failed to identify any evidence showing Fireman's Fund violated that provision with respect to any particular payment. Nor has Santee identified damages caused by the alleged roof-contractor dispute or by the failure of adjusters to visit the facility. The record reflects Fireman's Fund ultimately permitted Santee to use its preferred contractor.

Likewise, Santee's evidence concerning an underwriter's consideration of future policy renewal does not demonstrate the underwriter's communications affected adjustment of the existing claim. The non-cooperation provision was never invoked in connection with the claim.

In short, Santee failed to point to any evidence establishing Fireman's Fund lacked a reasonable basis for its decisions or any alleged unreasonable conduct caused compensable damages.

Under *Crossley and Peacock Automotive*, that failure is fatal to Santee's bad-faith claim. Consequently, the Court will grant summary judgment on Santee's bad faith claim, too.

### *G. Whether the Court should grant summary judgment on Santee's claims for attorney fees under S.C. Code Ann. § 38-59-40*

Santee also seeks attorneys' fees under S.C. Code § 38-59-40. That statute provides a statutory mechanism for attorneys' fees when an insurer refuses to pay a covered claim within the statutory framework and the trial court determines the refusal was without reasonable cause or in bad faith.

The statute fails to create an independent basis for fees merely because an insured disputes the amount of a claim. Santee must establish the underlying statutory predicates. Those predicates are absent here.

First, Santee has failed to establish Fireman's Fund breached the policy by withholding benefits to which Santee was entitled. Second, even assuming Santee could establish some contractual entitlement, the record fails to support a finding Fireman's Fund's refusal was without reasonable cause or in bad faith.

As the Court discussed at length above, Fireman's Fund had substantial contractual and factual grounds for its decisions concerning replacement costs for BR2, ACV, salvage, Hobby Lobby, and the invoices. Accordingly, the Court will grant summary judgment on Santee's claim for attorneys' fees under § 38-59-40.

### *H. Whether the Court should grant summary judgment on Santee's punitive damages claim*

Under South Carolina law, "[t]o justify an award of punitive damages, a plaintiff must demonstrate the defendant['s] conduct was willful, wanton, or undertaken in reckless disregard of plaintiff's rights." *Kuznik v. Bees Ferry Associates*, 538 S.E.2d 15, 32 (S.C. Ct. App. 2000).

"Punitive damages are quasi-criminal in nature and are imposed to punish a wrongdoer and to deter like conduct. . . . [A]n award of punitive damages must be proven under a significant burden of proof: clear and convincing evidence." *Longshore v. Saber Sec. Services, Inc.*, 619 S.E.2d 5, 11 (S.C. Ct. App.,2005)

The evidence here fails to satisfy that standard. At most, Santee has identified disagreements concerning the interpretation and adjustment of its insurance claim. But the Court is unable to agree with any contention a disagreement over the amount of benefits owed is, without more, evidence of willful, wanton, or reckless conduct.

To the contrary, as the Court has already detailed above, the record affirmatively demonstrates Fireman's Fund: accepted the storm damage as covered; advanced $500,000 shortly after the loss; paid approximately $1.8 million in ACV for BR2; paid more than $6.5 million in total claim benefits; investigated the claim using professional consultants; compromised the Hobby Lobby causation dispute notwithstanding its consultants' initial conclusions; offered Santee an accommodation concerning the two-year replacement requirement; and repeatedly explained the requirements for obtaining replacement-cost benefits.

Whatever disagreements existed between the parties, this record fails to show a reasonable jury could find by clear and convincing evidence Fireman's Fund " conduct was willful, wanton, or undertaken in reckless disregard of plaintiff's rights." *Id.*

"It is a firmly established rule in this state . . . 'punitive damages are not recoverable for a mere breach of contract.'" *Roberts v. Fore*, 98 S.E.2d 766, 768 (S.C. 1957) (quoting Williams v. Metropolitan Life Insurance Co., 176 S.E.2d 340 (S.C. 1957) . And because the Court will grant summary judgment on Santee's bad-faith claim, no independent tort remains to support punitive damages.

Fireman's Fund is therefore entitled to summary judgment on Santee's punitive damages claim as well.

## VI. CONCLUSION

In light of the foregoing discussion and analysis, it is the judgment of the Court Fireman Fund's motion for summary judgment is **GRANTED**, and Santee's claims are **DISMISSED WITH PREJUDICE.**

**IT IS SO ORDERED**.

Signed this 30th day of September, 2026, in Columbia, South Carolina.

/s/ Mary Geiger Lewis
MARY GEIGER LEWIS
UNITED STATES DISTRICT JUDGE